**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| KRISTINA D. LUCK, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY,<br><br>Defendant. | Civil Action No.: 0:26-CV-4864<br><br>**COMPLAINT - CLASS ACTION** |

Plaintiff Kristina Luck ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against 3M Company ("3M" or "Defendant"), based on personal knowledge as to herself and on information and belief derived from counsel's investigation, Plaintiff's benefits information, and other appropriate sources as to all other matters:

## NATURE OF THE ACTION

1. It is both unfair and unlawful for an employer to charge employees more for health coverage because they use tobacco unless the employer complies with the Employee Retirement Income Security Act of 1974 ("ERISA") and ***all*** its wellness program requirements. 3M charges different amounts for the same medical coverage depending on whether employees and covered dependents qualify for tobacco-free premium credits. Its benefits materials advertise a higher premium amount based on tobacco use. Plaintiff paid that higher amount (roughly $30 per month for each covered tobacco user). ERISA permits that health-based differential ***only if*** the wellness program meets every condition of the

statutory exception, including a compliant reasonable alternative that ensures that all similarly situated individuals who satisfy it receive the same full reward, as well as the required notice disclosures. *See* 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3)(C)–(E).

2. To impose a lawful tobacco surcharge, a plan must make available a compliant wellness program that gives employees an avenue to avoid the surcharge. Making such a program available means complying with the requirements of ERISA and the implementing regulations adopted by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments"). Congress authorized the Departments to promulgate regulations implementing ERISA's health-status nondiscrimination requirements. The Departments established a framework that must be satisfied to qualify for the statutory wellness-program exception or safe harbor. A plan sponsor invoking that exception must demonstrate compliance with each applicable requirement.

3. ERISA's regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, rather than operate as "subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations require a reasonable alternative standard through which participants may obtain the same, full reward for the applicable plan year, together with prescribed notice of that alternative and physician-

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

accommodation rights. *See* Final Regulations, 33159–63. A program must genuinely promote health or prevent disease. 3M imposed a tobacco-based premium differential while restricting qualification through the cessation alternative and failing to provide the required notice in participant materials describing the differential.

4. 3M's own materials establish the differential. The document titled "A Glance Inside Your 3M Total Rewards Package" (the "Total Rewards Guide") lists medical premium rates before and after discounts. Ex. A, 2020 Total Rewards Guide at 1. A footnote explains that the discounted rates include both the tobacco-free discount and the separate 3M Healthy Living discount. 3M's "Welcome to 3M" new-hire benefits guide (the "New Hire Guide") likewise describes the medical tobacco-free discount and states when tobacco users must complete a 3M-administered cessation alternative to qualify. Ex. B, New Hire Guide at 3–4. Plaintiff's benefit election confirmation documents identify a $30 tobacco credit for employees and dependents. These materials describe a contribution differential based on tobacco status.

5. The Total Rewards Guide is independently deficient. It sets out actual medical premium amounts and explains that the discounted prices include a tobacco-free discount, yet it gives no notice of the reasonable alternative standard, no contact information to request one, and no statement that a participant's personal physician's recommendations will be accommodated. Ex. A at 1. Although the New Hire Guide includes disclosures concerning reasonable alternatives and physician accommodations, the statute requires prescribed notice in "all plan materials" describing the program's terms (42 U.S.C. § 300gg-4(j)(3)(E)), and "a plan disclosure that references a premium

differential based on tobacco use . . . is a disclosure describing the terms of a health-contingent wellness program and, therefore, ***must include this disclosure***." 78 Fed. Reg. at 33166.

6. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues. The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.[2]

---

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

7. Outcome-based programs,[3] including a program that rewards tobacco-free status while directing tobacco users to a cessation alternative, must make the same full reward available to similarly situated participants who complete a compliant alternative. The Departments explained that every qualifying participant must receive the complete annual value of the incentive. Final Regulations, 33160, 33163. The New Hire Guide required completion of a program offered by the 3M Medical Plan Administrator "within 90 days of the beginning of the plan year or, if later, the date of your enrollment for that plan year." Ex. B at 3. Upon information and belief, substantially similar timing restrictions continued during relevant portions of the Class Period. A restrictive deadline that cuts off the reward for participants who complete an alternative later in the plan year, without an equivalent full-year credit, fails both the reasonable design and full reward requirements.[4]

---

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward. . . if a wellness program tests individuals for specified medical conditions or risk factors . . . and provides a reward to individuals identified as within a normal or healthy range for these medical conditions or risk factors, while requiring individuals who are identified as outside the normal or healthy range (or at risk) to take additional steps . . . to obtain ***the same reward***" as the individual within the normal range. 29 C.F.R. § 2590.702(f)(1)(v) (emphasis added).

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

8. 3M cannot invoke the statutory exception under 29 U.S.C. § 1182(b)(2)(B) and 42 U.S.C. § 300gg-4(j)(3) if its tobacco-based premium differential fails *any* mandatory condition for an outcome-based wellness program. The five criteria in 29 C.F.R. § 2590.702(f)(4) are cumulative. As pled here, 3M's program is deficient in its reasonable-alternative process, uniform availability of the full reward, and mandatory notice.

9. The additional contributions also provided an economic benefit to 3M. Upon information and belief, benefits under the Plan were, and continue to be, financed through a combination of employee contributions and 3M-provided funding, and 3M exercised authority over the collection, transfer, or use of participants' medical contributions. When tobacco-related deductions were applied to benefits or expenses that 3M otherwise would have funded, they reduced the amount of corporate money 3M needed to provide. To the extent 3M retained or controlled those amounts after they became Plan assets, it also obtained their use and time value. The current funding agreements, contribution records, and account transactions will show the extent and amount of those gains.

10. The New Hire Guide identifies a restrictive completion condition, and the Total Rewards Guide describes the tobacco discount without the prescribed notice. Exs. A at 1; B at 3–4. Upon information and belief, the challenged completion and credit practices continued, without an effective mechanism providing every qualifying participant the full value of the current-year discount, during one or more years of the Class Period. The particular terms and actual refunds or credits for each year are within 3M's records. The absence of adequate notice in Exhibit A independently defeats the wellness program exception for the program described there.

11. This Complaint challenges an additional cost imposed on participants based on tobacco status that was not accompanied by a *compliant* wellness program. 3M must establish the statutory exception it invokes to justify the differential. A deadline that gives participants an inadequate opportunity to complete an alternative and then withholds the full current-year reward from those who later satisfy it does not meet the reasonable design or uniform-availability requirements. Nor may a plan rely on an undisclosed administrative practice to satisfy the separate duty to inform employees of their rights in every material that describes the program's terms.

12. Participants like Plaintiff may challenge a tobacco-based premium differential when the employer fails to make a compliant alternative or mandated disclosures available. Once Plaintiff establishes the differential and pleads the deficiencies, 3M must show that the wellness-program exception applies, including compliance with the reasonable-design, full-reward, and notice requirements. *See* Final Regulations, 33163 (describing the wellness criteria as an "affirmative defense"); *cf. Cunningham v. Cornell Univ.*, 604 U.S. 693, 702–04 (2025) (discussing the burden on a party invoking an affirmative defense or exemption).

13. Plaintiff Kristina Luck resides in Waukon, Iowa, and has elected coverage under the Plan. Her benefit election confirmations show differences in the amount charged depending on whether the $30 employee tobacco credit and the $30 dependent tobacco credit are applied. Plaintiff brings this suit individually and on behalf of similarly situated participants and, as to the claim under ERISA § 502(a)(2), in a representative capacity for

the Plan. She requests appropriate equitable relief for unlawful premiums and recovery of profits resulting from fiduciary breaches.

## PARTIES

14. Plaintiff Kristina Luck resides in Waukon, Allamakee County, Iowa. She elected 3M-sponsored medical coverage throughout the relevant time period. Her benefit election confirmation documents identify a $30 employee tobacco credit and a $30 dependent tobacco credit, and Plaintiff incurred higher premiums when the applicable tobacco credit was not applied.

15. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

16. Defendant 3M Company is a Delaware corporation with its principal executive offices in St. Paul, Minnesota. 3M sponsors employee medical coverage, including PPO coverage and an employee medical welfare benefit plan (the "Plan") subject to ERISA. Upon information and belief, 3M determines or exercises authority over the implementation and communication of the tobacco-premium credit program and exercises control, directly or through persons it appoints, over the collection or disposition of employee contributions.

17. Upon information and belief, 3M acts through its officers, human-resources personnel, and designated administrators in implementing tobacco-status classifications, reasonable alternatives, premium-credit adjustments, and contribution handling. 3M is sued for fiduciary functions it actually performs or controls, including any exercise of authority over Plan assets, and not merely because it sponsored or designed a medical-benefits program.

18. The New Hire Guide explains that tobacco status is certified through enrollment, identifies the 3M Medical Plan Administrator as the source of qualifying cessation programs, and directs employees to HR Help concerning alternative standards. Ex. B at 3–4. The Total Rewards Guide sets medical premium amounts varying with tobacco-free discounts. Ex. A at 1. Administering those rules requires decisions about status certifications, qualification, premium credits, and the handling of participant contributions. Upon information and belief, 3M performed or controlled material aspects of that administration or retained fiduciary authority to appoint and monitor those who did. The precise division of responsibility will be established through discovery.

19. The Plan through which Plaintiff receives medical coverage is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) and (3). Upon information and belief, its medical benefits and administrative expenses are funded in whole or in part by 3M and participant contributions. 3M acts as a fiduciary to the extent it exercises discretionary authority over Plan administration or authority or control over Plan assets. 29 U.S.C. § 1002(21)(A).

## **JURISDICTION AND VENUE**

20. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action seeks relief under ERISA, a federal statute.

21. This Court has personal jurisdiction over 3M because its headquarters and principal executive offices are in St. Paul, Minnesota, and it sponsors and administers employee benefit programs from Minnesota. Upon information and belief, material

decisions concerning the tobacco-status premium differential, plan contributions, benefits communications, and delegated administration were made or controlled from Minnesota.

22. Venue is proper in the District of Minnesota under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because 3M resides and may be found in this District. 3M maintains its principal executive offices in St. Paul, and, upon information and belief, significant decisions relating to the Plan and challenged tobacco-premium administration were made or controlled from Minnesota.

## FACTUAL BACKGROUND

### I. 3M'S TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements.

23. ERISA prohibits a group health plan or health insurance issuer from discriminating in premiums or contributions based on a health-status-related factor, including tobacco use. A plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); *see also* 42 U.S.C. § 300gg-4(b)(1).

24. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness

programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

25. Congress authorized the Secretary of Labor to prescribe regulations necessary or appropriate to carry out ERISA Title I, including its group-health-plan requirements. *See* 29 U.S.C. §§ 1135, 1191c. ERISA also incorporates the applicable Public Health Service Act requirements, including PHSA § 2705, through 29 U.S.C. § 1185d(a)(1). The statutory and regulatory framework therefore governs the Plan's tobacco-based premium differential. *See* 42 U.S.C. § 300gg-4; 29 C.F.R. § 2590.702.

26. Exercising that delegated authority, the Departments issued regulations in 2006 outlining the criteria for the wellness-program exception. *See* Final Regulations, 33158–59. Following the expansion of ERISA's protections over health benefits, 42 U.S.C. § 300gg-4, the Departments proposed amendments in November 2012 and adopted the Final Regulations on June 3, 2013. Those regulations apply to plan years beginning on or after January 1, 2014. 78 Fed. Reg. at 33158–59. They govern the medical premium differentials challenged during the relevant Class Period.

27. The Final Regulations specify the requirements that a health-contingent wellness program must satisfy to qualify for the statutory exception. The Departments explained that the rules establish criteria for an affirmative defense to a claim of health-status discrimination. Final Regulations, 33163. Once a participant alleges a discriminatory surcharge and facts showing the program's deficiencies, the employer invoking the exception must establish that its program satisfies the applicable statutory and regulatory conditions.

28. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***.").

**B. Regulatory Criteria.**

29. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: the applicable limit is generally 30% of the total cost of coverage, increased to 50% to the extent attributable to tobacco-prevention or reduction programs. Employee-only coverage is the baseline unless a class of dependents may participate, in which event the applicable enrolled coverage cost is used. 29 C.F.R. § 2590.702(f)(4)(ii). Plaintiff does not assert a separate percentage-cap violation.

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice: all materials describing the program's terms must disclose the availability of a reasonable alternative or applicable waiver, include contact information for obtaining the alternative, and state that personal-physician recommendations will be accommodated. The same requirement applies to disclosures that an individual failed the initial outcome-based standard. 29 C.F.R. § 2590.702(f)(4)(v).

30. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

31. Regarding the first criterion, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a

reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

32. A central requirement is that the full reward remain available to all similarly situated individuals who satisfy a reasonable alternative during the applicable plan year. 29 C.F.R. § 2590.702(f)(4)(iv). Although a plan has flexibility concerning how to deliver the portion of the reward attributable to earlier months, it must deliver the full value rather than keep those amounts permanently. The Departments explained:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

33. The regulations also distinguish a genuinely furnished reasonable alternative from leaving participants to locate one without assistance. Example 8 addresses a plan that imposes a tobacco surcharge while requiring participants to find and pay for their own cessation program, and explains why that arrangement fails. See 29 C.F.R. § 2590.702(f)(4)(vi), Example 8; Final Regulations, 33180. 3M's New Hire Guide identified a cessation program offered by the medical-plan administrator, but the availability of such

a program does not excuse a separate failure to award the full reward or give the required notice. Ex. B at 3–4.

34. For health-contingent wellness programs, the Final Regulations require that the notice be disclosed "in ***all plan materials*** describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge participants more based on tobacco use and fail to provide the prescribed notice cannot invoke the wellness program exception.

## II. 3M CANNOT INVOKE ERISA'S WELLNESS PROGRAM EXCEPTION

35. The Total Rewards Guide describes 3M medical coverage and compares base and discounted premium amounts for Choice Advantage, Prime Advantage, and Basic PPO coverage at four enrollment tiers. It states that the "After Discounts" amounts include both the tobacco-free discount and a separate Healthy Living discount. Ex. A at 1. The medical premium therefore depends in part on tobacco-use status. Plaintiff's confirmation documents separately identify a $30 employee tobacco credit, showing that tobacco status is an independent contribution component.

36. ERISA permits a medical premium differential based on tobacco status only if 3M satisfies the rules for an outcome-based wellness program, including a compliant

alternative available to all qualifying individuals, the full reward, and proper notice. See 29 U.S.C. § 1182(b)(2)(B); 29 C.F.R. § 2590.702(f)(4). The New Hire Guide identified an alternative based on completion of a cessation program offered by the 3M Medical Plan Administrator. Ex. B at 3–4. The existence of that program alone does not establish that a participant who completed it later in a plan year received the full financial value of the reward.

37. The New Hire Guide states that employees and dependents can qualify for the medical tobacco-free discount by certifying that they have been tobacco-free for the preceding 12 months or that they have completed a qualifying quit-smoking or tobacco-use program within the preceding 12 months. The New Hire Guide also offers a cessation program for tobacco users and imposes a separate completion deadline. Ex. B at 3, 5. The program thus rewards individuals meeting the initial health standard while requiring others to take additional steps to obtain the same lower medical contribution.

38. For tobacco users relying on the plan-administered cessation alternative, 3M's New Hire Guide imposed completion "within 90 days of the beginning of the plan year or, if later, the date of your enrollment for that plan year." Ex. B at 3; *see also id.* at 5. The language ties the deadline to the first 90 days of the year, unless the employee enrolled later, in which case it identifies the date of enrollment rather than providing a fresh 90-day completion period. On information and belief, 3M maintained materially similar restrictions during one or more years of the Class Period. Whether a later enrollee was given additional time, and whether participants who completed the alternative outside the stated cutoff received full annual credits, are facts within 3M's possession.

39. That deadline creates a serious obstacle for participants who do not already satisfy the tobacco-free standard. A participant may learn of the alternative only after the plan year begins or may need more than 90 days to complete cessation counseling. For an individual enrolling after the initial 90 days, the Guide's stated deadline is the enrollment date itself. Ex. B at 3. Requiring completion by that point, and then withholding the same annual discount from an employee who completes the alternative later, would make the alternative unreasonably burdensome and undermine its health-promoting purpose. Upon information and belief, 3M's implementation had that effect during at least part of the Class Period. See 29 C.F.R. § 2590.702(f)(4)(iii)–(iv).

40. A separate defect arises if participants who complete a reasonable alternative during the plan year fail to receive the full annual discount. The Departments explained that a plan may provide the portion attributable to earlier months by refund, credit, or equivalent allocation over the remaining year, but must provide its full value. Final Regulations, 33163. Upon information and belief, 3M's restrictions denied some participants who completed the alternative later the full reward available to similarly situated tobacco-free participants. The New Hire Guide does not disclose a method for restoring the complete annual value after the stated deadline. Ex. B at 3–4.

41. The Total Rewards Guide supplies a separate basis for liability. Its medical premium table identifies the tobacco-free discount and the price paid with and without available discounts, yet it says nothing about the reasonable alternative, whom to contact about obtaining it, or accommodation of recommendations from a participant's personal physician. Ex. A at 1. A document that sets out the prices employees will pay under a

wellness incentive describes a material term of that program, rather than merely announcing that a program exists. 78 Fed. Reg. at 33166.

42. The New Hire Guide includes some of the information missing from the Total Rewards Guide. It tells employees who cannot meet a reward standard that they may qualify for the same reward through different means, provides an HR Help telephone number, and states that HR Help will work with them and, if they wish, their doctor, to find an appropriate program. Ex. B at 3–4. Plaintiff does not contend that the New Hire Guide is silent about physician involvement. The defect alleged in the Total Rewards Guide is independent: that document describes the tobacco-related premium discount but omits those protections altogether. Ex. A at 1.

43. The regulations allow the prescribed notice to use substantially similar language. 29 C.F.R. § 2590.702(f)(6). They require, however, that ***every*** plan material describing the program's terms disclose the reasonable alternative or waiver, contact information, and the protection for recommendations from a participant's personal physician. A disclosure in one older enrollment guide cannot excuse the absence of the required notice from a later premium schedule that describes the wellness-program discount. *Id*. § 2590.702(f)(4)(v).

44. The New Hire Guide discusses tobacco-status certification, a cessation alternative, its completion deadline, and HR contact information. Ex. B at 3–5. The Total Rewards Guide instead states the premium figures and tobacco-related discount without those disclosures. Ex. A at 1. Plaintiff does not allege that the New Hire Guide remained the governing document for every later plan year. The applicable annual plan documents

and practices, including any changes to deadlines, physician accommodations, or retroactive premium credits, are in 3M's possession. Their production will permit those issues to be tested against the regulatory requirements.

45. Plaintiff's enrollment confirmation materials show that tobacco status remains a separate medical premium-credit classification. They do not by themselves establish how 3M handled participants completing cessation alternatives later in the year but, upon information and belief, the timing and full reward deficiencies challenged here affected one or more years within the Class Period. The applicable benefit terms, payroll transactions, completion records, and credits are within 3M's possession.

## III. 3M'S SELF-DEALING AND PROFIT FROM THE TOBACCO SURCHARGE

46. 3M's participant-facing materials show that it established a tobacco-free credit for medical coverage and communicated detailed certification and alternative-standard procedures. Upon information and belief, 3M or persons acting under its control exercised discretion in implementing the status classifications, qualifying cessation alternatives, making premium corrections, and handling resulting participant contributions. Plaintiff will establish the extent of 3M's current fiduciary authority through discovery.

47. Upon information and belief, the medical coverage at issue is financed through contributions from employees and 3M, whether paid through a trust or other funding account, paid to an insurer, or applied toward plan expenses. To the extent 3M bears medical-benefit or administrative costs from its own assets, an additional contribution extracted from employees because of tobacco status can reduce the funds 3M

must contribute. Plaintiff alleges that 3M obtained that benefit from the challenged premium differential during the Class Period. The precise funding structure and amounts are reflected in plan and account records controlled by 3M or its administrators.

48. The economic relationship is straightforward. If tobacco-related medical contributions are applied to expenses that otherwise would require 3M funding, they preserve corporate funds. Upon information and belief, additional contributions collected under the challenged program displaced some of 3M's own expenditures or otherwise furnished the company with the possession, use, or time value of participant-derived assets. Plaintiff seeks an accounting to distinguish ordinary lawful plan funding from profits or other gains obtained through fiduciary breaches.

49. The Total Rewards Guide shows that 3M communicated the medical premium differential, and the New Hire Guide instructs participants how to certify their tobacco status and qualify through a cessation program. Ex. A at 1; Ex. B at 3–4. Upon information and belief, 3M also exercised authority over administering the resulting charges and credits. Plaintiff does not challenge 3M's mere decision, acting as employer, to establish contribution rates as a fiduciary act. She challenges discretionary implementation and communication of the program, the handling of participant contributions after they became Plan assets, and any use of those assets for 3M's own benefit.

50. Upon information and belief, participant contributions collected under the medical premium schedule were applied to medical claims, insurance or administrative charges, or other expenses associated with the Plan. The governing funding and cost-

allocation arrangements determined which expenses 3M would otherwise have paid. If 3M used unlawfully collected participant contributions in place of corporate funds it was otherwise obligated or expected to provide, or retained those contributions in employer-controlled accounts after they became Plan assets, it received an economic gain from the challenged conduct. The amounts and any applicable exemptions are matters for accounting and proof.

51. The New Hire Guide identifies the status-certification and qualification process and routes employees through 3M's enrollment and HR systems. Ex. B at 1–4. The Total Rewards Guide identifies the corresponding medical premium rates. Ex. A at 1. Upon information and belief, 3M implemented medical contributions through payroll deductions and retained or supervised material control over status corrections, premium adjustments, refunds, transfers, and the disposition of contributions. Those acts are distinct from the nonfiduciary decision to offer the benefit program in the first instance.

52. Participant contributions withheld from employees' wages for Plan coverage become Plan assets at the earliest date they can reasonably be segregated from the employer's general assets. 29 C.F.R. § 2510.3-102(a)(1), (c). At that point the persons exercising control over the assets are fiduciaries to the extent of that control. Upon information and belief, 3M possessed, controlled, or directed the application of the challenged surcharge proceeds and used them to fund medical benefits or expenses that otherwise would have required corporate funds.

53. That use could produce profit or another monetary benefit even if the Plan remained sufficiently funded to pay participants' medical claims. Additional employee

contributions used in place of corporate contributions preserve the employer's cash; amounts retained in employer-controlled accounts after becoming plan assets can also generate float or other time-value benefits. ERISA § 409, 29 U.S.C. § 1109(a), separately requires a breaching fiduciary to make good losses to the Plan and to restore profits made through use of Plan assets.

54. The amount and duration of any 3M gain are within its possession. Relevant records include employee deductions, tobacco-status certifications, annual premium-credit schedules, cessation program records, applicable insurance or medical expenses, plan and trust account statements (if any), employer funding records, and transfers of contributions. They will establish whether the tobacco-related collections displaced corporate funding, when the amounts became Plan assets, whether 3M retained control after that time, and the profits or losses that may require restoration.

## IV. PLAINTIFF'S INJURY AND 3M'S PREMIUM-ADMINISTRATION PRACTICES

55. 3M's Total Rewards Guide sets out a medical premium differential associated in part with the tobacco-free discount. Ex. A at 1. The New Hire Guide explains that employee and dependent tobacco status affects eligibility for that discount and identifies a plan-administered cessation alternative. Ex. B at 3–5. Plaintiff's benefit-election confirmations continue to identify tobacco-related premium credits. Together, those materials support a tobacco-status price differential, while proof of the actual amounts paid in each year resides in enrollment and contribution records. The benefit enrollment materials identify a $30 tobacco-related credit for the employee and a separately

stated $30 credit for a dependent. They reflect different prices depending on whether those credits are applied.

56. 3M's New Hire Guide conditioned qualification through the plan-administered cessation program on completion within the first 90 days of the plan year or, if later, the enrollment date. Ex. B at 3, 5. Upon information and belief, materially comparable timing restrictions were administered during some of the Class Period. Upon information and belief, 3M did not reimburse or otherwise provide the full annual economic value to all similarly situated participants who satisfied an alternative standard, specifically the participants who completed the program after the 90-day deadline.

57. Access to a cessation program and receipt of the full annual premium reward are separate requirements. Even if employees remain free to participate in cessation counseling later in a plan year, they receive an unequal financial reward if the Plan does not return or credit the earlier charges upon completion. Upon information and belief, the timing and credit practices described above permitted that result during relevant parts of the Class Period.

58. Because tobacco credits are assigned by employee or dependent status, 3M's systems necessarily track which individuals are charged the higher contribution, which monthly credits are applied, and when any qualifying change becomes effective. Those common records can determine the amounts paid under the differential and whether 3M supplied the same full reward to participants completing a reasonable alternative later in the plan year.

59. The information needed to evaluate the challenged conduct is maintained by 3M or its chosen administrators. It includes contemporaneous plan-year program descriptions, required notices, cessation records, actual refunds, credit effective dates, payroll deductions, and funding records. Plaintiff seeks disclosure of these documents through ordinary discovery and does not premise the claims on a supposed refusal of an administrative appeal that has not been established.

60. Plaintiff does not ask the Court to decide whether a particular medical service was covered or to award reimbursement for a denied medical claim. She challenges the plan-wide lawfulness of the tobacco-status premium differential, the sufficiency of its program terms and notices, and fiduciary handling of related contributions under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2)–(3).

61. Exhibit B describes 3M's enrollment rules, and Exhibit A describes its premium rates and tobacco-free discount. These documents establish their own terms and dates; neither is pled as the complete governing instrument for all relevant years. Plaintiff alleges on information and belief that substantially similar objectionable timing or notice practices continued during one or more years of the Class Period. The operative documents, amendments, notices, and reimbursement procedures for those years are within 3M's possession.

62. Plaintiff seeks relief for money actually collected pursuant to the challenged differential, as well as prospective compliance, and reserves the right to amend once the governing records are produced.

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action individually and on behalf of similarly situated individuals under Federal Rule of Civil Procedure 23(a) and (b)(1), including a representative claim for Plan-wide relief under ERISA § 502(a)(2). The "Class Period" is the period from six years before the filing of this action through entry of final judgment, subject to applicable limitations periods and appropriate refinement after discovery.

64. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the United States who, during the Class Period, paid a premium differential based on tobacco-use status in connection with their participation in 3M-sponsored employee medical coverage, including coverage under the 3M Employee Welfare Benefit Plan.

65. Excluded from the Class are 3M's officers and directors, persons responsible for the challenged fiduciary conduct, the judicial officers assigned to this action, and their immediate families.

66. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

67. **Numerosity**. The tobacco-free medical discount appears across multiple 3M coverage options and tiers, and the New Hire Guide addresses both employees and covered dependents. Ex. A at 1; Ex. B at 3–5. Upon information and belief, at least hundreds of employees and dependents were charged a tobacco-based differential during the proposed

Class Period. The precise number and their identities are ascertainable from 3M's records. Joinder is impracticable.

68. **Commonality**. This action involves questions of law and fact common to the Class, including:

a. whether 3M's tobacco-free discount and corresponding higher medical contributions constitute a premium differential based on a health-status-related factor;

b. whether 3M provided a reasonably designed alternative and the same full annual reward to similarly situated participants;

c. whether a 90-day completion deadline, the denial of qualification after that cutoff, or the failure to make retroactive or equivalent premium adjustments complies with 29 C.F.R. § 2590.702(f)(4)(iii)–(iv);

d. whether 3M supplied the prescribed alternative-standard and physician-accommodation notice in all Plan materials describing the premium differential;

e. whether 3M acted as a fiduciary or engaged in prohibited transactions in administering the surcharge and applying participant contributions for its own financial benefit;

f. whether 3M prudently supervised the cessation-alternative and refund procedures, premium-credit implementation, participant communications, and handling of Plan assets;

g. the proper means of equitable restitution, surcharge, accounting, restoration of Plan losses, and disgorgement of 3M's profits or other gains.

69. **Typicality**. Plaintiff participates in the same 3M medical benefit program and is subject to the same tobacco-status premium-credit rules as the proposed Class. Her claims arise from the same centrally adopted timing, notice, and contribution practices, regardless of variations in coverage tier, month, or whether a dependent credit was also at issue.

70. **Adequacy of Representation**. Plaintiff will fairly and adequately represent the Class. She is enrolled in 3M medical coverage and is affected by the challenged

tobacco-status premium differential. She has retained counsel with substantial experience prosecuting ERISA class actions. She has no known interests adverse to the Class and seeks the same statutory and equitable protections for similarly situated participants.

71. Class treatment permits one adjudication of 3M's common premium-credit requirements, reasonable-alternative procedures, notices, and fiduciary handling of related contributions. Separate actions seeking Plan-level restoration or correction of common administration could establish incompatible standards or impair other participants' interests, supporting Rule 23(b)(1). Venue is proper here because 3M has its headquarters and benefit operations in Minnesota.

## CAUSES OF ACTION

## COUNT I

### UNLAWFUL PREMIUM DIFFERENTIAL – FAILURE TO PROVIDE A COMPLIANT REASONABLE ALTERNATIVE STANDARD AND THE FULL REWARD

**(Violation of ERISA § 702, 29 U.S.C. § 1182(b), and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(C)–(D); 29 C.F.R. § 2590.702(f)(4)(iii)–(iv); 45 C.F.R. § 146.121(f)(4)(iii)–(iv))**

72. Plaintiff re-alleges and incorporates by reference paragraphs 1–71 of this Complaint, excluding the allegations of the other Counts.

73. ERISA prohibits group health plans from requiring participants to pay more for coverage based on a health-status-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). 3M's tobacco-free credits make medical coverage more expensive for participants classified as tobacco users. That difference is lawful only if 3M satisfies every condition of the statutory and regulatory wellness program exception. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3); 29 C.F.R. § 2590.702(f)(4).

74. Among those mandatory conditions, an outcome-based program must be reasonably designed to promote health and must make the full reward available to all similarly situated individuals through a reasonable alternative standard or, where applicable, a waiver. 42 U.S.C. § 300gg-4(j)(3)(C)–(D); 29 C.F.R. § 2590.702(f)(4)(iii)–(iv). An alternative that permanently withholds part of the reward from an otherwise qualifying participant does not satisfy that requirement.

75. The New Hire Guide expressly conditions qualification through the 3M-administered cessation alternative on completion within 90 days after the start of the plan year or, if later, by the date of enrollment. Ex. B at 3, 5. For someone who enrolls after the first 90 days, the Guide does not provide another 90-day completion period. Upon information and belief, materially similar limitations continued during one or more years of the Class Period. The operative annual terms, any alternative accommodations or waivers, and their actual application are in 3M's possession. A requirement that forecloses a meaningful chance to complete the alternative, or denies the current-year reward for later completion, fails the reasonable design and full reward rules.

76. Participants who do not already satisfy the initial tobacco-free standard may be unable to complete a designated cessation program within the Guide's abbreviated window, especially when enrollment occurs after the first 90 days of the plan year. Ex. B at 3. Upon information and belief, at least some participants who completed the cessation alternative later in the same year were denied some or all of the applicable tobacco-free premium credit. A similarly situated employee who satisfied the initial tobacco-free

standard received the reward. That unequal financial value, rather than mere access to a cessation activity, is the disparity challenged here.

77. Section 2590.702(f)(4)(iv) requires the same, full reward to be made available to participants who satisfy a compliant alternative during the relevant plan year. The Departments recognized that a plan may provide credits for earlier months through a refund, later installments, or an equivalent mechanism; it cannot permanently withhold those amounts. Final Regulations, 33163. Upon information and belief, 3M did not provide the full current-year credit to at least some participants affected by the restrictive completion rule. Plaintiff does not seek to transfer the separate rules governing optional life insurance to medical coverage.

78. By using a 90-day completion restriction that, upon information and belief, denied otherwise qualifying participants the full annual reward, 3M failed to make a compliant alternative available and therefore cannot rely on ERISA's wellness-program exception. Plaintiff challenges the legality of the differential paid under the challenged program, not the correctness of a particular medical claim payment.

79. The differential is therefore an unlawful difference in the price of health coverage based on a health factor, in violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b), as incorporated by 29 U.S.C. § 1185d(a)(1). Participants who actually paid additional contributions lost those amounts and their use.

80. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits participants and beneficiaries to enjoin practices violating ERISA and obtain appropriate equitable relief. Plaintiff and the Class seek restitution of identifiable funds, an accounting, equitable

surcharge against fiduciaries where authorized, disgorgement, declaratory relief, and other appropriate equitable remedies, without double recovery.

## COUNT II

## UNLAWFUL PREMIUM DIFFERENTIAL – FAILURE TO PROVIDE REQUIRED NOTICE

**(Violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v))**

81. Plaintiff re-alleges and incorporates by reference paragraphs 1–71 of this Complaint, excluding the allegations of the other Counts.

82. 3M's medical premium schedules charge different amounts based in part on tobacco-free status. Ex. A at 1. Plaintiff alleges that she and other participants were subject to the tobacco differential and paid more for coverage due to a health factor. ERISA prohibits the premium difference unless every condition of the wellness-program exception, including notice, is satisfied. 29 U.S.C. § 1182(b)(1)–(2); 42 U.S.C. § 300gg-4(b), (j); 29 C.F.R. § 2590.702(f)(4).

83. One of those conditions is notice. 3M was required to disclose the availability of a reasonable alternative standard in ***all Plan materials*** describing the terms of its outcome-based wellness program and in any disclosure that a participant failed the initial standard. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v).

84. The prescribed notice must disclose the availability of a reasonable alternative or, where applicable, waiver, provide contact information for obtaining the alternative, and state that recommendations of the participant's personal physician will be accommodated. 29 C.F.R. § 2590.702(f)(4)(v). The regulation permits its sample language

or substantially similar language, but a plan must still communicate the substance of the required protections. *Id*. § 2590.702(f)(6).

85. The Total Rewards Guide lists base and discounted medical rates for coverage. Its rate-table footnote explains that the discounted rates include the tobacco-free and 3M Healthy Living discounts. Ex. A at 1. The dollar amounts and discount labels convey material economic terms of the health-contingent program because they tell participants how much less they may pay for the same medical coverage.

86. The Total Rewards Guide omits the availability of a reasonable alternative, contact information for obtaining it, and any statement accommodating the recommendations of a participant's personal physician. Ex. A at 1. Its discussion goes beyond a bare reference to the existence of a wellness program: it sets out specific medical premium rates and explains that tobacco-free status changes those rates. An employee evaluating that schedule is told the financial consequence of the tobacco standard but not the rights that the regulations require the Plan to disclose. Upon information and belief, there are other participant-facing materials describing the premium differentials tied to tobacco use, and they do not provide the required notice disclosures.

87. The New Hire Guide, by contrast, discusses alternatives and gives participants an HR Help number. It also states that HR Help will work with them and, if they choose, their doctor in finding an appropriate program. Ex. B at 3–4. Plaintiff acknowledges those statements. But the New Hire Guide does not explain how participants who complete a reasonable alternative after the stated deadline can obtain the full annual reward. Further, the Total Rewards Guide does not contain any of the necessary protections

in its description of the tobacco-related medical premium discount. Ex. A at 1. A disclosure in one guide does not relieve 3M of the duty to include required notice in other participant-facing materials describing wellness program terms.

88. The omission is material. The Departments explained that wellness-program terms affecting premiums, including the availability of a reasonable alternative, generally must appear in the SPD and applicable governing documents. Final Regulations, 33166 n.24. ERISA also requires an SPD to reasonably apprise participants of their rights and obligations and circumstances that may result in loss of benefits. 29 U.S.C. § 1022(a)–(b). Plaintiff asserts no separate claim under § 1022 here; these requirements underscore the importance of complete program disclosures.

89. The regulatory language does not require any particular incantation; it permits substantially similar notice. 29 C.F.R. § 2590.702(f)(6). The critical question is whether each material describing the program's terms communicates the required protections. The New Hire Guide demonstrates that 3M knew how to advise participants about alternatives, contact information, and doctor involvement. Ex. B at 3–4. The Total Rewards Guide does none of those things, although it specifies the premium discount. Ex. A at 1.

90. The notice omission in Exhibit A is independent of any dispute about actual reimbursements. The Guide describes the medical tobacco-free discount but provides none of the prescribed notice for obtaining the same reward through an alternative or accommodating physician recommendations. 29 C.F.R. § 2590.702(f)(4)(v). Upon

information and belief, comparable omissions affected additional premium descriptions provided to employees during relevant parts of the Class Period.

91. Because 3M failed to give prescribed notice in all Plan materials describing the differential, the resulting tobacco-status premium distinction violates 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b), incorporated through 29 U.S.C. § 1185d(a)(1). Plaintiff and the Class seek relief for amounts actually paid under the challenged differential and for loss of use of those funds.

92. Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks appropriate equitable relief, including restitution of traceable amounts, disgorgement, equitable surcharge against a fiduciary where appropriate, an accounting, declaratory relief, and suitable injunctive and other equitable relief, without duplicate recovery.

## COUNT III

## BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)

**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109; Brought Under 29 U.S.C. § 1132(a)(2))**

93. Plaintiff re-alleges and incorporates by reference paragraphs 1–71 of this Complaint, including the allegations concerning 3M's fiduciary status, administration of the surcharge, treatment of participant contributions, and resulting financial benefit, but excluding the allegations of the other Counts.

94. Upon information and belief, 3M exercised fiduciary authority over administering tobacco-status classifications, qualification through cessation alternatives, credit adjustments, and participant communications. The New Hire Guide describes 3M-directed enrollment, HR Help services, and a medical-plan administrator offering the

qualifying program. Ex. B at 1–4. The Total Rewards Guide identifies the resulting medical premium differential. Ex. A at 1. Those materials support the inference of a centrally administered program; the precise fiduciary assignments and delegations will be established from current Plan records.

95. Upon information and belief, 3M, acting through officers, employees, or delegates, determined or controlled how participants were classified, how cessation-completion rules were applied, when tobacco credits took effect, and what medical premiums were collected. Whether 3M retained discretion or delegated any of those functions, and which persons exercised authority over the resulting Plan assets, are shown by the current Plan and administration records.

96. 3M was also a functional fiduciary to the extent it exercised authority or control over Plan assets. Employee medical contributions are collected by payroll deduction, and those designated for Plan coverage become Plan assets at the time established by 29 C.F.R. § 2510.3-102(a)(1). Upon information and belief, 3M exercised control over receipt, custody, transfer, application, or repayment of participant contributions associated with tobacco-related medical premiums. *See* 29 U.S.C. § 1002(21)(A).

97. Upon information and belief, 3M used company personnel, a medical-plan administrator, and enrollment or payroll providers to administer the tobacco credit and medical contributions. The New Hire Guide expressly identifies a 3M Medical Plan Administrator, HR Help, and the FIRST Line Center. Ex. B at 1–4. To the extent 3M

retained fiduciary authority to appoint, review, or monitor delegates administering the challenged practices, it was required to exercise that authority prudently.

98. In its actual fiduciary capacities, 3M was required to act solely in the interests of participants and beneficiaries, with appropriate care, skill, prudence, and diligence, and consistently with governing documents insofar as consistent with ERISA. 29 U.S.C. § 1104(a)(1)(A), (B), (D). ERISA also prohibits a fiduciary from dealing with Plan assets in its own interest or for its own account. 29 U.S.C. § 1106(b)(1).

99. The challenge concerns the way 3M or its fiduciary agents administered the tobacco-status rules and controlled participant-derived contributions. 3M implemented the eligibility and credit process, communicated participant rights, withheld contributions, and directed their disposition. Upon information and belief, those functions were fiduciary to the extent they involved discretionary Plan administration or control of Plan assets. Plaintiff does not claim that an employer's ordinary decision to adopt a contribution rate is itself a breach of fiduciary duty.

100. The additional medical amounts were withheld from wages as contributions for Plan coverage. Under 29 C.F.R. § 2510.3-102(a)(1), (c), those sums became Plan assets as soon as they could reasonably be segregated from employer property. They therefore implicated fiduciary duties independent of the initial plan-design decision. To the extent 3M controlled those funds after the triggering point, it was required to handle them for the Plan and its participants rather than its own advantage.

101. Upon information and belief, 3M-funded medical coverage combines participant contributions with corporate resources, whether through insurer premiums, an

employee-benefits trust, another Plan account, or payments from 3M's general assets. 3M or its fiduciary agents controlled at least some portion of the receipt, allocation, and use of tobacco-related participant contributions. Plaintiff alleges that additional contributions collected through the challenged program were applied to medical benefits or expenses that otherwise would have required funds from 3M. The governing arrangements, funding obligation, and actual disposition of the funds are subjects for discovery.

102. The additional tobacco contributions supplied 3M with an economic benefit to the extent they displaced corporate contributions that 3M otherwise would have made. Upon information and belief, that substitution or another benefit from the use of participant-derived Plan assets occurred. The fact and amount of any savings must be established by comparing participant collections, Plan expenses, employer contribution obligations, and the relevant account transactions. Plaintiff challenges gains arising from fiduciary handling of an unlawful differential, not the ordinary use of lawful employee premiums to fund coverage.

103. Upon information and belief, 3M also obtained avoided expenditures, retained cash, interest, float, investment returns, or other financial benefits through the receipt, retention, and use of unlawful participant contributions. Plaintiff seeks an accounting of the accounts receiving the deductions, the timing of transfers to any trust or other Plan account, any expenses paid with the funds, and any employer contributions avoided because of that additional funding.

104. 3M breached its fiduciary duties to the extent it administered the tobacco-credit program under a restrictive 90-day completion policy that denied qualifying

participants the full annual reward, permitted material premium descriptions to omit the prescribed physician-accommodation notice, and continued to collect contributions based on a noncompliant program. Upon information and belief, 3M or its fiduciary agents had authority to correct the alternative process, the notice communications, and the actual payroll treatment but failed to do so.

105. If 3M contends that late completers in fact could receive full reimbursement or that physician-directed alternatives were available through unpublished or separately described procedures, fiduciaries responsible for participant communications still had to administer and disclose material rights prudently. Requiring participants to pay an additional medical premium while the means of securing its full removal remain obscure, incomplete, or inconsistent with the announced timing restriction fails that obligation to the extent 3M acted in a fiduciary capacity.

106. Upon information and belief, 3M failed to conduct prudent periodic review of the cessation completion deadlines, annual credit eligibility, retroactive adjustments, participant communications, medical-plan payroll deductions, and custody of Plan contributions. The Total Rewards Guide plainly omits the required physician-accommodation assurance. Upon information and belief, the timing restrictions were evident to administrators. Those unlawful restrictions, year after year, support an inference of inadequate review during at least part of the Class Period.

107. To the extent 3M delegated these functions to administrators or other fiduciaries, it failed to monitor those delegates within the scope of its retained fiduciary responsibilities. Upon information and belief, 3M knew or should have known the program

affected participants' premiums and the Plan's contribution streams but failed to ensure that a late participant received the full reward, all relevant materials contained required notice, and participant Plan assets were protected from use for 3M's own benefit.

108. 3M's economic interest made prudent review particularly important. If tobacco-status collections reduced the company's contribution obligations, 3M benefited from permitting a noncompliant program to generate additional participant funding. Upon information and belief, that interest was present when it allowed the challenged premium and credit practices to continue. The existence and amount of any resulting employer gain can be determined from plan funding, payroll, and account records.

109. Such acts violated ERISA's duties of loyalty and prudence to the extent performed in a fiduciary capacity. 3M administered or controlled the challenged contribution practices to its own economic advantage, failed to ensure availability of the same full reward, and failed to convey material participant rights. *See* 29 U.S.C. § 1104(a)(1). The claim concerns unlawful administration and misuse of participant-derived funds, rather than the ordinary payment of lawful medical contributions.

110. The challenged conduct also constituted prohibited transactions. 3M is a party in interest as employer and Plan sponsor. 29 U.S.C. § 1002(14). Upon information and belief, in its fiduciary capacity, 3M caused Plan assets derived from the noncompliant medical premium differential to be applied for its own benefit, including as a substitute for corporate funding, in violation of 29 U.S.C. § 1106(a)(1)(D), and dealt with those assets in its own interest or for its own account, in violation of § 1106(b)(1). Any applicable

statutory exemption is for Defendant to establish. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 702–04 (2025).

111. ERISA § 409, 29 U.S.C. § 1109(a), makes a breaching fiduciary liable both for losses to the Plan and for profits made through use of Plan assets. A fiduciary cannot retain a demonstrable profit merely because the Plan ultimately paid covered claims. Plaintiff seeks those distinct forms of Plan-level relief only to the extent supported by the actual funding and transaction records and applicable law.

112. Upon information and belief, 3M's improper administration caused unlawful participant contributions to finance costs 3M otherwise would have paid, generated profits from use of Plan assets, or both. The claimed loss to the Plan and 3M's avoided expenditures, cash float, earnings, and other gains are subject to accounting. Plaintiff seeks no double counting of the same dollar under different equitable theories.

113. 3M maintains or controls records necessary to measure any gains or losses: tobacco-status certifications, premium schedules, individual payroll deductions, plan funding policies, trust and custodial account statements, transfers, claims and expenses, records of corporate contributions, and delegate agreements. Those records will reveal whether the additional contributions displaced employer money and whether amounts remained in employer accounts after becoming Plan assets.

114. Plaintiff asserts this claim in a representative capacity for the Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). She seeks restoration under 29 U.S.C. § 1109(a) of proven Plan losses and fiduciary profits, along with an accounting and appropriate equitable relief. To the extent restored assets represent unlawful amounts

collected from participants, she requests equitable administration of their return to affected persons without duplicate recovery.

**<u>COUNT IV</u>**

**BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)**

**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106; Brought Under 29 U.S.C. § 1132(a)(3))**

115. Plaintiff re-alleges and incorporates by reference paragraphs 1–71 of this Complaint, including the factual allegations concerning 3M's fiduciary authority, administration, control of contributions, financial benefit, and failure to monitor, but excluding the allegations of the other Counts.

116. 3M was a functional fiduciary to the extent it actually exercised discretion over administering the Plan's tobacco credits or cessation program or exercised authority or control over participant medical contributions once they became Plan assets. The New Hire Guide identifies company benefits resources and the 3M Medical Plan Administrator, and the Total Rewards Guide identifies the tobacco-based pricing. Ex. A at 1; Ex. B at 1–4. Upon information and belief, 3M controlled or approved the relevant premium communications, credit adjustments, and handling of Plan assets.

117. In a fiduciary capacity, 3M administered or permitted a tobacco premium differential under a program that, upon information and belief, imposed unreasonable completion restrictions and did not deliver the full current-year reward to all qualifying participants. The Total Rewards Guide independently omitted the required notice of alternative standards and physician accommodations. Ex. A at 1. 3M failed to correct the

challenged administration and communications despite its authority to do so, causing participants to incur additional contributions.

118. To the extent 3M contends it offered full retroactive credits or individualized physician-directed alternatives, it was obligated, when acting as a fiduciary, to disclose and implement those important protections prudently. Material information about how to avoid an extra charge for medical coverage cannot be withheld while participants pay the higher premium.

119. Upon information and belief, 3M also failed to prudently monitor fiduciary delegates responsible for the challenged practices. 3M had reason to know of the financial consequences of its premium-credit rules and the omissions in the Total Rewards Guide. To the extent it retained monitoring authority, it failed to correct those deficiencies or protect participants from the added contributions and improper disposition of Plan assets.

120. Those failures directly injured participants who paid the tobacco-related premium differential and lost use of the resulting payroll deductions. The injury is the additional cost of medical coverage under a program that does not satisfy the statutory exception, together with any independently provable injury caused by fiduciary misrepresentations or omissions, not simply lack of information in the abstract.

121. Upon information and belief, extra tobacco-related contributions were applied to medical benefits or expenses that would otherwise have required 3M funding or were retained in employer-controlled accounts after becoming Plan assets. In either event, 3M obtained the benefit of avoided expenditures or the possession, use, and time value of participant-derived funds. The funding agreements, accounts, transactions, and whether

those funds were handled in a fiduciary capacity will determine the extent of any profit or recoverable loss.

122. Plaintiff seeks equitable restitution of identifiable funds or their proceeds, a constructive trust or equitable lien where traceable, disgorgement of fiduciary profits, and equitable surcharge for proven losses caused by fiduciary breaches. An accounting is necessary to determine which amounts 3M collected, which it transferred to the Plan or any trust, which it retained, and any profits or saved expenditures arising from its fiduciary conduct.

123. 3M's financial interest heightened the need for impartial administration and monitoring. To the extent extra employee contributions displaced corporate funding, the same practice that increased participants' medical costs conserved 3M's money. The fiduciary claim is directed to implementation, communications, exercise of administrative authority, and disposition of Plan assets, not to a nonfiduciary decision to design or amend a health plan.

124. Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek appropriate equitable relief for fiduciary breaches, including restitution, equitable surcharge, disgorgement, an accounting for profits, a constructive trust or equitable lien over traceable assets, declaratory relief, and other relief the Court finds appropriate. These remedies are pleaded alternatively or cumulatively as legally permitted, without double recovery, and Plaintiff does not seek payment of medical-treatment benefits under § 1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against 3M Company and that the Court award the following relief:

A. An Order certifying this action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned as Class Counsel;

B. A declaration that 3M's tobacco-based premium differential violates ERISA § 702, 29 U.S.C. § 1182, and applicable wellness-program requirements;

C. An Order requiring 3M, through appropriate equitable relief, to return or credit the additional amounts Plaintiff and Class Members actually paid for medical coverage under the noncompliant differential;

D. A declaration that 3M breached fiduciary duties or engaged in prohibited transactions under 29 U.S.C. §§ 1104 and 1106 through the challenged administration, omissions, monitoring failures, or use of participant Plan assets for its own benefit;

E. An accounting of tobacco-related participant contributions, credits, refunds, timing of payments and transfers, disposition of funds, and resulting losses, profits, or other financial benefits;

F. Injunctive relief requiring compliant disclosures and a reasonable-alternative procedure that provides the full annual reward to every qualifying participant and protecting participant contributions from improper use;

G. Disgorgement of profits, avoided expenditures, float, investment returns, and other financial benefits proven to have been obtained by 3M through the challenged fiduciary conduct;

H. Equitable restitution of traceable amounts and proceeds, including a constructive trust or equitable lien where appropriate, for Plaintiff and Class Members;

I. Equitable surcharge against 3M for actual losses caused by its fiduciary breaches or unjust enrichment properly remedied through that form of equitable relief;

J. Plan-level relief under 29 U.S.C. §§ 1109 and 1132(a)(2), including restoration of Plan losses and profits made through the use of Plan assets, an accounting, replacement of responsible fiduciaries if appropriate, and equitable administration of any restored participant contributions;

K. An award of prejudgment interest on amounts awarded, as permitted by law;

L. An award of reasonable attorneys' fees, expenses, and taxable costs under ERISA § 502(g), 29 U.S.C. § 1132(g), the common-fund doctrine where applicable, or other applicable authority; and

M. Any other relief the Court determines to be just and proper, without duplicate recovery.

Dated: November 16, 2026

Respectfully submitted,

/s/ *Bryan Bleichner*

Bryan Bleichner (MN # 0326689
Philip J. Krzeski (MN # 0403291)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave., Ste. 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
bbleichner@chestnutcambronne.com
pkrzeski@chestnutcambronne.com

**SIRI & GLIMSTAD LLP**

Oren Faircloth (*pro hac vice* forthcoming)
William H. Payne (*pro hac vice* forthcoming)
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (929) 677-5181
ofaircloth@sirillp.com
wpayne@sirillp.com